Good afternoon. Illinois Appellate Court First District Court is now in session. The First Division, the Honorable Justice John C. Griffin presiding. Case number 1-7-1-7-3-9, People v. Martin Dante Hill. Welcome. Would the attorneys who are going to argue please state your name and spell your last name? My name is Appellate Defender's Office, representing Martin Hill. Good afternoon, your honors. Assistant State's Attorney Alan Spellberg, S-P-E-L-L-B-E-R-G, representing the people of the state of Illinois. Thank you. I think you both have know how this works. So you each get 20 minutes. Counsel, do you want to reserve some time? Yeah, I reserve about two or three minutes for rebuttal. That should be all I need. Great. All right, thank you very much. Proceed whenever you're ready. Okay, thank you. May it please the Court, Counsel, Martin Hill's 54-year sentences for offenses committed when he was 15 years old violates the Eighth Amendment where the sentencing court failed to sufficiently consider his youth and its attendant circumstances and his potential for rehabilitation, regardless of his eligibility for day-for-day good conduct credit. The resentencing court did not implicitly or explicitly find that the defendant was irretrievably depraved, permanently incorrigible, or beyond the possibility of rehabilitation as required by Holman prior to entering what amounts to a de facto life sentence under Buffer, Peacock, Thornton, Reyes, and more recently Daniel. Before, before we get into the merits, there's a question about jurisdiction here. We could not find in the record any order from the trial court that vacated the 2015 hearing which was referred to. We've looked at the transcript and there's nothing there where the judge actually orally or in writing entered an order to that effect, you know, vacating or... What is your response? Well, my response is, I mean, I'm actually surprised by that because I recall, and I'm just going off of my recollection of, you know, my, you know, without delving into all of my detailed notes, my recollection is different. I thought that the court actually did, it was certainly odd, I thought, the way the post-conviction itself was handled in terms of, you know, I recall that the court bifurcated it and separated the actual innocence claim from the sentencing one, but even prior to that, I do vaguely recall that the court did make the finding. In other words, the PC lingered on the call for quite some time. I recall it was started around 2001 and then, you know, it was, we're talking like over a decade later, then, you know, Miller came down in 2012 and then so on. I think it was after Davis, and as I recall, the court then said because of those cases, I'm gonna order resentencing. I don't remember, you know, specific language or anything like that, but I recollection of it. I mean, I wish I can respond further and more deeply, I mean, because I, again, I don't have that part of that in front of me, but I mean that that's my recollection, understanding of it. I mean, I would hope if I'm wrong about that, or maybe I'm missing something, I would, you know, maybe ask for the opportunity, I guess, to, you know, perhaps see if I can find something to the contrary, because I don't recall there not, I guess, not being an order, or I just, my understanding was that the court actually did order a vacature of the original sentence and ordered the resentencing in light of Miller and, at that time, Davis. Just to help Mr. Spellmayer, who might be looking that up right now, and you can do too, in the record, the citations of the record 173 through 176. But it appears that there may have been a misunderstanding, but the judge was told that that's what the parties wanted. It was clear. Counsel said, I think to be safe, entering an order vacating the sentence would be appropriate. That has been our understanding with Judge Porter is that the sentence, if it had not been vacated, would be vacated. And the court said, so I'll say defendant remanded to Cook County. Is that what the state believes ought to happen? Remand him to Cook County Jail. State, yes, judge. And then later, the judge says, by agreement 12-15-15, remanded to the Cook County Jail, held pursuant to no bail. So there isn't anything that we found. But you can go on with your, if there's something we missed, I just bring it to our attention. Yeah, I guess I would ask for the opportunity if I may. Of course, I know it's within court's discretion, but maybe perhaps after the argument, if I get an opportunity to maybe peruse it and see if I can address that more specifically, just to the extent that I can't do it right now off the top of my head. I'm afraid if I try to open up the electronic record, I'll somehow screw this Zoom thing up. I'm not asking you to, but proceed with your argument. Okay, sure. But again, to the extent, and by the way, real quickly before I do that, I mean, I do recall it was kind of messy the way it was handled. But getting back to the substance, you know, the court did not explicitly or implicitly find that level of depravity as required by Holman. Instead, despite the substantial mitigating evidence from Dr. Cunningham in particular, and I mean, correctional officers, the court basically just focused on the facts of the case and the gravity of the offense and Hill's alleged role in his participation as a principal gunman. I think the latter point I really would like to spend a little bit of time on, because I do think that, you know, the court basically said that his participation as one of the shooters was as part of the court's justification for imposing this sentence. And I do, you know, I do quote the language at length in the opening brief, but I want to highlight, because it says, in particular, because the court says, regardless of the reference to the Miller stuff and, you know, the acknowledgement of what Dr. Cunningham testified, the court said Hill's has to be significant based on the gravity of the crime and Hill's role as one of the shooters. Again, it's bothersome to me, because when he says and Hill's participation as high as it could be, doesn't even acknowledge the fact that, I mean, this was hotly contested. I mean, his role in the offense was not clear cut. And at trial, the state even took the alternate that he was either the gunman, or as Hill stated in his statement, which, by the way, was also backed up by Ransom, that he was actually in the back seat on the driver's side. But isn't the issue here, I mean, isn't the issue whether he's incorrigible and beyond being redeemable? Yeah, at the end of the day, at the end of the day, sure. I mean, under that, that is certainly the main point that the court... Isn't that what we should be doing, then, is looking at Holman and Miller and the five factors? No, sure. Yes. What the judge looked at those factors and what came out as a result of that. Sure. And I think, and I only allude to his role into just, I guess, to support my argument that that's all he looked at, or that's primarily what he looked at, and not exclusively what he looked at, and did not look and did not consider the Holman, and did not make a Holman finding, and did not either implicitly or explicitly find that he was incorrigible. And there was no grounds for him to do that anyway. Again, Dr. Holman testified at length as to his background, social economic background. It was about as detailed as they come. And I think even in the court's own findings, when the court did come around to basically just mentioning the facts of the case and his role as a shooter, the court even said, well, your prison record, your time in the last 12 years or however long you had been in prison at that time, had been exemplary. So that's some recognition that he was the opposite of incorrigible. You know, since you bring that up, would you address the day-for-day issue as far as, because it's, on the one hand, we're saying, and you spent a lot of time on it, I think, in your reply brief, but on the one hand, we're saying that we shouldn't be considering because the court has no control over that. It's a Department of Corrections issue. On the other hand, we're saying, hey, but he did, he's really good. He's really behaving himself. And I think with the day-for-day, and I could be wrong on this, but I thought it was like he'd be getting out at age 44 or something like that. So anyway, would you please address that for us? Thanks. I'm sorry. Could you repeat the last part of your question? I kind of lost you there. Yeah, no problem. I could be wrong, but I think it was that he would be getting out at age 44? Yes. Something like that. And so, but if you wouldn't mind addressing that, please. Yeah, I mean, I certainly acknowledge that it's, you know, he's getting out, I believe, in 2024. I think he's served already, by math serves me, around 22 years already. He was only 15 when all of this occurred. So yeah, I mean, you know, he's certainly relatively young as far as, you know, middle age, I guess, if that. But I guess it still comes down to what has been recognized since Peacock. And now, again, more recently with Reyes and Daniel, you know, the bottom line is that they can still revoke it at any time. And they don't really, and even Buffer, they didn't take into account, you know, like the chronological, or I guess didn't have a chance to consider, you know, just mere chronological age, or at what point of his life he was out. I mean, Buffer says what it says. It's 40 years, and the Supreme Court was pretty clear on that. And there's no provision for, or exception for, you know, if he gets out at 44 versus 54 or 64. So, I mean, I think that's kind of the short of it. I don't, because as far as, I mean, you're right. I mean, his age, I mean, that's established. And yeah, he will be 44. But again, what Buffer said, and what the cases since Buffer have said, regarding, you know, the fact that it's, you know, the grace of the IDOC, they're the ones that ultimately decide. And, you know, don't know how or what they can decide from this point on. But, I mean, it's whatever is judicially imposed, in this case, 54 years. Thanks. Sure. Counsel, the state argues that the seriousness of the offense, or the crime is the most important factor, and that it's more important than anything in litigation. Do you want to respond to that as it relates to juvenile? In other words, the fact that this was considered a serious, or we look at the underlying facts of the crime, and that trumps his youth, and all the attendant circumstances of youth. Am I understanding that correctly? Yeah, I'm asking you to respond to the state's argument. The state is arguing that the seriousness of the crime is the most important factor, and that it outweighs anything in mitigation. And I'm asking you to respond to that. I'm sorry, as it relates to a juvenile defendant. Well, it's different as it relates to a juvenile defendant, because it ignores these factors in Miller and Holman. I mean, when we're talking about the context of juveniles, we're talking about a completely unique set of circumstances. I mean, maybe that proposition might be more appropriate when you're talking about adult and offenders with fully-formed brains. But in the context of juvenile sentencing and juvenile offenders, it should be a completely different equation, because that's the whole point of it. The whole point is how different juveniles are. And as far as the seriousness of the crime itself, I mean, that doesn't speak to all of the underlying conditions of the immaturity of juveniles and what prompts them to put themselves in that situation to begin with. Or like in this case, I think presents basically a textbook scenario on that hallmark of youth, in particular as it relates to peer pressure, the idea that youth are more susceptible to going along and getting themselves in situations that involve criminality, in this case, to the extent that it involved an 18-year-old and older offenders, one of whom basically ordered him to get into the car. And I think it's also further evidenced by Ransom agreeing— And just so we're clear, that person was an adult also, right? Oh, absolutely. Yes. Yes. 18-year-old, 18-year-old. Absolutely. Absolutely. And the court, I think, kind of peripherally made reference to it, but it really deserves a lot of attention because Dr. Cunningham testified to just that whole dynamic, and this is spot on. I mean, this is that textbook definition of that condition of the immaturity of the youth brain. And so we have these older offenders, in particular the 18-year-old who ordered Hill to get into the car. And Hill's just walking down the street. He's not even part of this group initially. And then he ends up sitting in the backseat, according to Ransom and according to Hill himself. And they both agree that, hey, he didn't even shoot. He wouldn't shoot because he's a punk, which, of course, makes reasonable and perfect sense if you're talking about a 15-year-old ordered to get into a car by an adult. And I think that's what was ignored or, at best, given very, very short shrift. And that's what sets this case apart from what you describe as, well, we can look at the seriousness of the offense, and maybe it should be considered more than maybe anything in mitigation. But youth as a mitigation is completely different. I mean, that's the whole point of Miller. That's the whole point of the brain science. That's the point of Dr. Cunningham's testimony and those who testified about his rehabilitative efforts since he's been incarcerated. So I think that it's too simplistic and an improper approach in the context of juvenile offenders. I hope that answers the question. But, yeah. What about the state's argument that we should not follow Peacock or Thornton? Well, I guess it's because, again, and I don't recall them citing any authority to support that. But, I mean, it essentially relies on this idea that, well, even though Buffer didn't speak to it, that, well, it still, I mean, to the fact that he could get out in half the time, you know, it relies on some suppositions that there's no guarantee of happening. So I don't think those cases are wrongly decided. It makes perfect sense. That's the only way to, we have to look at what's judicially imposed. I don't think those cases are flawed in any way, shape, or form. So I just don't think it's a tenable position to just say, well, because he could, you know, maybe, you know, because of, or maybe said, you know, we should get into the deciding what the Department of Corrections may do to come up with some other formula. And I just, it just doesn't seem very tenable. I mean, there has to be some set of standard or predictability here. And I think to the extent that you're just going to rely, it makes perfect sense to rely on what sentence is peacock in the case of that have since relied on it on peacock and in interpreting buffer, it makes it sound, well sound reasoning. If you want to reserve some time, you're pretty much up, but did you want to finish up, please? Yeah, I'll just wrap up here. I think, I mean, I'm grateful for your questions. I think it gave me the opportunity to address most of it. I just, I guess I'll just sum up by saying the 54 year sentences for offenses that committed when he was 15 constitute de facto life sentences. And thus they should, they are, they do violate the eighth amendment and they should be reduced to either time served or should be remanded for this case should be remanded for resentencing. Thank you very much. Thank you, Mr. Stolberg. Thank you again. Good afternoon, your honors council. First in regards to justice Heiman's question regarding jurisdiction. Unfortunately, I wasn't able to peruse through the record during council's argument regarding it. I don't remember a particular order as you say, specifically vacating the conviction, but obviously the parties then proceeded to a full resentencing hearing. So even in the absence of a particular order under the doctrine of revestment, where all the parties engage in a manner inconsistent with the final judgment, clearly I would say the appellate, the trial court had jurisdiction and was able to impose a new sentence ultimately in this case, the 54 years, plus the six years for the attempt. So you would agree that reinvestment would provide us with a jurisdiction. In this instance, yes, your honor, I would say that in the absence of a specific written order, vacating the original sentence, the ultimate conduct of the parties and the court to go forward on a resentencing hearing resulting in a new sentence being issued would serve to provide jurisdiction for this court. Thank you. As to the other issues, there are actually two issues in this case. The first is, as was presented in the defendant's opening brief, was the 54-year sentence imposed by the judge at the resentencing hearing, was it excessive? Then after the fact, after buffer comes out, after peak comes out, the question has now become whether or not that 54-year sentence, and I would actually submit to your honors that the court shouldn't be looking at 54 years, should be looking at the 60-year aggregate sentence, because that is what the whether or not the 60-year aggregate sentence is a de facto life sentence under the buffer line of cases. Obviously, the key to that answer is whether or not the Peacock line of cases is correct, whether or not the application of day-for-day credit, the statutory grant, the statutory availability of day-for-day credit for anyone who committed a crime prior to June 19, 1998, whether or not that has any bearing on the determination of whether or not a sentence is a de facto life sentence. It is our position that the Peacock line of cases, Peacock, Thornton, Daniel, the other cases that have held that way, are wrongly decided, that they place too much of an emphasis upon the necessity of a guarantee of the availability of the good time credit and the guarantee that the Department of Corrections will not revoke that credit. It is our position that that notion is inconsistent with buffer and Miller and Montgomery, that nowhere in those cases does it say that a defendant must be guaranteed release, just the opportunity, a meaningful opportunity to be released. And the best authority for that, I would say, is this court's decision in People v. Evans, which obviously was decided before buffer came down. Obviously, we recognize it's been vacated by the Supreme Court sentence in remand of reconsideration letter buffer. And in that case, as we now know, the 90-year sentence that was imposed in Evans, even with the day-for-day availability of credit, which would, to this court, reduce it to 45 years, would still be a de facto life sentence under buffer. But the key language in Evans, and I would ask you to just consider it as persuasive authority, the key language in Evans is that the availability of day-for-day credit in that case is based on the Reyes case from the Illinois Supreme Court, demonstrates that a defendant has the opportunity for release, he has the opportunity for parole. The problem with your argument, though, is we can't rely on Evans. It's been vacated, and Reyes is too old of a case, well before all this. So, I mean, that would not be appropriate, would it? Your Honor, again, and that's why I said I recognize it's been vacated, and you can still look to it to a persuasive, you, Your Honor, yourself. It doesn't seem very persuasive, though, in light of the number of cases now coming out just the opposite of what you're saying. Your Honor, I understand that there are a number of cases that have allowed Peacock. I'm not going to deny that, including there's additional ones that counsel hasn't mentioned have come down since then, but that doesn't mean that they're not wrongly decided. It's our position that they have been wrongly decided, that they place too much of an emphasis on the role. Okay, I understand your argument, but if we don't agree with that argument, okay, now where are you? Well, Your Honor, then I will admit that the trial court in this case did not ever intend to impose a life sentence or de facto life sentence. The trial court did not find that the defendant was incorrigible. The court specifically found that his conduct in the Department of Corrections, since he was originally sentenced, was exemplary. The court said that his conduct deserved a significant reduction. That's why the court, when it was considering a range of years, chose one right in the middle at six years, 54 plus six. So I cannot say that the judge in any way believed that the defendant was incorrigible. And if this court were to find that the 54 year plus six years amounts to a de facto life sentence, then yes, it doesn't seem to satisfy the buffer line of cases. There's no other conclusion I think can be drawn from this I want to say I appreciate your candor. Thank you, Your Honor. If it is not a de facto life sentence, then the question really does become, is it an excessive sentence? And whether or not it's an excessive sentence is a different analysis, far more deferential to the trial court. The rule regarding whether or not the severity of the offense, the significance of the offense, the defendant's mitigation, his rehabilitative potential, those are all factors that the trial court has to balance and decide where to go and how to find it. And those factors, in this instance, the record is clear, the trial court considered every single factor that was presented to him, every fact was well aware of the facts of the case, was knowledgeable as he had served as the trial judge presiding over the original trial in the first instance, and was aware and made determinations, made factual findings in his role as the sentencing court, made determinations, discretionary determinations as to what the proper sentence would be. And as he said, the defendant's conduct reserved to be given some mitigation consideration, but the facts of the crime was also significant. This was a double murder with a third person who was shot in the head, so a double murder plus an attempt murder, and for those reasons the trial court believed that the significant sentence of 54 years plus six years was appropriate. And that is not, as we say in our brief, an abuse of discretion is an ordinary question of is the sentence excessive? Because in any other instance, this would be the precise type of sentence that would be given for a much less type of murder where only one person was murdered, where only one person and a second person was injured. And so we're not talking about a juvenile at 15 years old who has arguably has met all the factors, if you look at all the factors in Miller Holman, has done what fits in there, and if you ignore the day for day, which we talked about, you're up against the maximum being 40 years. Your Honor, yes, again ignoring the day for day, but as I would say based upon the record, the trial court considered all of that and was well aware of how long the defendant had been in custody, was well aware when he would likely be released, was well aware as to what the role of the defendant's conduct both in custody and hopefully what his experience would be out of it, including in what his life was like before he was ever arrested. But he wasn't aware, he wasn't aware of Buffer at the time. No, he was not aware of Buffer, nor was he aware of Peacock. He can blame the judge, but we have to apply Buffer, and we have to apply the cases following Buffer. Yes, Your Honor, and we recognize that. If I could take a step back towards the Peacock point though, if I could just make a point out as to why this record demonstrates why Peacock is wrong. One of the, in Peacock in the case, that one of the major arguments regarding those cases is that there's no guarantee that the Department of Corrections won't revoke the credits, that they have the authority to do so, and that it is something that can be done, and so therefore the defendant has no real true expectation of being released. This record shows otherwise, because as the, as former Superintendent Bard testified, the defendant, while he was in custody, had 10 tickets and I believe 16 disciplinary violations, and he had no time revoked for any of that, and some of those violations were very significant. He was caught with contraband, he was disobeying orders, he was fighting, and no time was ever revoked for him. Instead, he was placed in segregation as a punishment, and he had restrictions on commissary, and so to assume that the revocation of good time credit is an easy thing for the Department of Corrections to do, or a one of the first instance, is incorrect, and this record shows that, and as we know, we can look to the Department of Corrections for the anticipated release date, we can look to see what's going on, it is, even has been recognized in this argument, this defendant is expected to be released in 2024, after serving slightly less than 30 years in custody, because he will be getting all of the statutorily guaranteed good time credit. But we don't know that, because something could happen between now and then, and it is, every year is different, so. Yes, Your Honor, something could happen, but that's, that's the key, is that what Montgomery says, you have to be given an opportunity to release. If the defendant, while in custody, is not engaging in disciplinary violations, is not engaging in types of errors or concerns, he won't be placed at risk of losing any good time credit, and it's for that reason that he has that significant opportunity for release. He has the opportunity for parole that Montgomery and this Court in Evans recognized is the way to satisfy the Miller line of cases, is because this defendant, if he continues to be an exemplary inmate in the structured environment of the Department of Corrections, will be released after 30 years of imprisonment. Your argument, then, is those exemplary inmates will be treated differently than those who may have had problems. Is that what the law should be? Differentiating the two, because if he had had problems and had a few extra years, and he'd be treated differently, and he's still, well, they're still both youths, we're talking about youths, and we're still talking about the developing mind of the under 18, so how can you justify it on the basis of whether they, you know, prison is a very difficult place to, and there's a lot of restrictions, and even if you are in good behavior, and they said this, the judge even said he was one of the most outstanding records he's seen in his career, and this is a very experienced judge, so that says a lot, and yet he had, as you mentioned, you know, 16 write-ups and so forth, so where does that lead us? Well, Your Honor, I would say that that leads us to, one, the expectation is that every person in the Department of Corrections should engage in exemplary behavior, that they should be complying with the rules, and I understand, of course, people are human be perfect in their regard, whether they're in a structured environment or an answer. Sometimes they're not complying because they're trying to defend themselves, and then I guess that has to be explained later on, but if he's being attacked, and because he refuses to submit to someone who may be trying to assault him in some way, does that, so, and now he gets a ticket, or he gets into a fight, and now that's on his record, and they decide, oh, we're giving him some more time, we're not going to give him that extra day for day because of this fight that he just had, and sometimes, I mean, in prison, people have to actually, you have to fight someone else off of you, rather than submit to them. Your Honor, yes. So, therefore, I just don't know how we consider what the Department of Corrections is going to do, so I'm kind of, I'm asking the same question that Justice Hyman is asking, I don't know how we consider that, you know, how do we do that when there's no way that we can guarantee what's going to happen? Your Honor, my response, that is, my answer is that the Eighth Amendment doesn't require us to guarantee that they can't happen. What the Eighth Amendment requires is that for a juvenile offender, like the defendant in this case, to be given a meaningful opportunity for release. And I think that our Supreme Court has said that that's 40 years. Our state legislature has said that that's 40 years, and you've admitted that there was no finding of incorrigibility, there was no finding that he was beyond rehabilitation. So, I think that leaves us with what our state has already told us to do in this case. Your Honor, if I could just respond, you are correct that the Illinois Supreme Court and Buffer set the time period of 40 years for a de facto life sentence, relying on the legislative amendments that were made following Miller v. Alabama. But Buffer and those legislative amendments were written with the notion that murders committed at that time are subject to a 100% truth in sentencing requirement. So, that 40 years that they talk about in Buffer is one of 100% time. It is 40 years of incarceration. Now, I recognize that the Peacock line of cases has said otherwise. That issue is pending in front of the Illinois Supreme Court already, and it will be decided. But the notion of Buffer saying any sentence of 40 years, regardless of whether or not it's subject to day-for-day credit, is inconsistent with what Buffer talks about. When Buffer looks to the 40 years, they find that 40-year time frame based upon the certain types of murders that would be subject to mandatory natural life, the murder of a police officer, for example. They say our legislature said that that is the time period that they have said is the equivalent of a natural life sentence if this murder is committed by a juvenile. That 40-year sentence was intended by the legislature to be a significant period of incarceration for a juvenile if he commits one of those special types of murders. To say that the availability of day-for-day credit is irrelevant would mean that if a defendant committed a murder of a police officer on June 18, 1998, and received a 41-year sentence, he would be entitled to be released after 21 years. But if a defendant committed a murder of a police officer on June 20, 1998, the day after truth and sentencing became effective, he could be sentenced to a 40-year sentence with full time required, 100% time required, without implicating the Eighth Amendment at all. And so that's why we say that the Peacock line of cases is absurd because it creates a differentiation as to the expectation of release, the opportunity for release, is defined by buffer based upon the arbitrary fact that the Illinois General Assembly adopted truth and sentencing in 1998. And so instead, what is our position is that you have to look at the actual time the defendant is likely to spend incarcerated. If he is only going to spend half the time incarcerated, and I think I can say that in all of our experience, it is extraordinarily rare for anybody to have any time revoked. It's certainly not 100% of the time or 50% of the time. But if you have to consider the amount of time he is going to serve in custody, just like the trial judges do when they're imposing sentence, just like the Supreme Court did when it addressed the Reyes case and specifically said that a 32 year sentence, a 32 year period of incarceration in Reyes was not a de facto life sentence. And so that's why it is our position as well as the position of the Illinois Attorney General that the Peacock line of cases were not correctly decided. And as I said, if they were not correctly decided, and that this is not a de facto life sentence in this case, then the only question is whether or not this was an excessive sentence. And it's our position that it's not as we state. But I recognize if this were a de facto life sentence, then this would be something that we would have agreed to a summary disposition because a 60 year aggregate sentence, if accepting the Peacock line of cases is correct, would be an invalid de facto life sentence in this case. If there's no further questions. Thank you very much. Thank you. Counsel, Mr. Gonzalez, you're, you're, we need to get you, you're, you're muted. Sorry about that. Okay. Can you hear me? Okay. Yes. Okay. Yeah. Sorry about that. I, I certainly agree with Councilor Spelberg about regarding the, the fact that you got to add all these up and, and, and, you know, and buffer says what it says. So I'm going to just limit my comment just to a brief remark about the, on the excessive sentencing issue, because, you know, the part of that calculus and part of the equation is again, and I, and I'm going to emphasize this again, because I feel it's that important when the court made this determination as to, as to Hill's alleged role in the offense. I think what's overlooked with the court completely ignored and what the state ignores in its brief is the fact that this was far from settled and, and the jury in the underlying trial was actually given an accountability instruction. That's how unsettled the question was. And so, so, and there was pre-trial motions filed and there was a whole, there was a whole arguments presented as to what Hill's role exactly was. I mean, this was far from settled. I mean, this idea that somehow his culpability was as high as it can be is just flat out wrong. And so the jury, so normally a jury finding one could suppose that a finding of verdict in this case would somehow necessarily mean a finding of, as a principal, but that not in this case, because the jury was instructed both as a, on the issue of accountability. And so the jury could easily found him guilty as an account, as an accountability theory. So this idea that we weigh this as if his level of culpability was as high as it could be, I mean, that just, that's just flat out wrong. And to the extent that that was a main focus and part of why this 54 year times two, or I'm missing 54 year concurrent 54 plus six, 54 year sentence was imposed. I think wholly unjustified because that did, that was a major part of the impetus as to why that number of years was chosen. So unless there are any other questions, I have no further rebuttal. Okay. Thank you very much. Great job as always. I appreciate the briefs, the arguments, and you'll be hearing from us shortly. Thank you.